# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

REBECCA SUE YOUNG,

                                  Plaintiff,

        v.                                       7:13-CV-734
                                                     (NAM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                  Defendant.

_____

STEVEN R. DOLSON, ESQ., for Plaintiff
MONIKA K. CRAWFORD, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Norman A. Mordue, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On January 22, 2009, plaintiff "protectively filed"[1] applications for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, alleging disability beginning November 22, 2008. (Administrative Transcript ("T.") 12, 80-81, 200-209, 241, 246). The claims were initially denied on

_____

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.

or about May 22, 2009, and plaintiff filed a timely request for an administrative hearing. (T. 12, 80-81, 110-11). On March 23, 2011, a hearing was conducted before Administrative Law Judge ("ALJ") Bruce S. Fein, at which plaintiff testified. (T. 52-72). On May 27, 2011 ALJ Fein issued an unfavorable decision. (T. 85-98). Plaintiff timely appealed the determination to the Appeals Council, which subsequently granted review on September 8, 2011and remanded the matter to ALJ Fein. (T. 101-02).[2]

On February 15, 2012 a second hearing was conducted before ALJ Fein, at which plaintiff and vocational expert Victor Alberigi testified. (T. 28-51). On April 23, 2012, ALJ Fein issued an unfavorable decision in the matter (T. 9-27), which became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on April 22, 2013. (T. 1-6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering

---

[2] The Appeals Council directed the ALJ to supplement his evaluation of plaintiff's mental impairments, using the special technique described in 20 C.F.R. §§ 404.1520a and 416.920a, and to incorporate corresponding limitations in plaintiff's RFC. The ALJ was also instructed to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the plaintiff's occupational base. (T. 101-02).

his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*, 697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  It must be "more than a scintilla" of evidence scattered throughout the administrative record.  *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision.  *Id*.  *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record.  *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony).  However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions."

*Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.    FACTS

As of the date of the second administrative hearing in February 2012, plaintiff was 39 years old.  (T. 28, 200, 241).  She reported earning her GED (T. 68, 251), and had past work experience as a cashier, construction worker, home health aide, and waitress (T. 247-48, 267-75).  Plaintiff claimed disability based on chronic, radiating neck and back pain; vasovagal syncope[3]; and mental health disorders variously characterized as depression, anxiety, and bipolar disorder.  (T. 32-36, 58, 62, 64, 246, 281, 374, 379, 459, 585).

The ALJ's April 23, 2012 decision provides a detailed statement of the medical and other evidence of record (T. 15-17, 18, 19-21), which the defendant's brief (at 1, Dkt. No. 15), adopts by reference.  Rather than detailing the evidence in this case at the outset, the court will discuss the relevant facts below, as necessary to address the issues raised by plaintiff.

## IV.    ALJ's DECISION

The ALJ determined that plaintiff met the insured status requirements for DIB through September 30, 2009, and found that she had not engaged in substantial gainful activity since her alleged onset date of November 22, 2008.  (T. 15).  Next, the ALJ determined that plaintiff had the following severe impairments: chronic neck and back

---

[3] "Vasovagal syncope . . . is one of the most common causes of fainting.  Vasovagal syncope occurs when your body overreacts to certain triggers, such as the sight of blood or extreme emotional distress."
http://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/basics/definition/con-200269 00.

pain, depressive disorder, and anxiety disorder. (T. 15-17). The ALJ found that plaintiff's impairments did not meet or equal the criteria of any listed impairment in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (T. 17-18).

The ALJ next determined plaintiff's residual functional capacity (RFC), concluding that plaintiff could perform less than a full range of sedentary work. (T. 18-19). Specifically, the ALJ found that plaintiff could lift and/or carry up to ten pounds occasionally and frequently, stand and/or walk up to six hours and sit up to six hours in an eight-hour workday, and perform postural maneuvers occasionally; but she could not reach overhead with the right upper extremity. (T. 18-19). The ALJ further found that plaintiff retained the mental RFC to perform simple tasks and instructions and occasionally interact with the public, supervisors, and coworkers (T. 19). In making his RFC determination, the ALJ assessed the plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms, including her claim that she could not turn her head, and concluded that they were not fully credible. (T. 19-21).

Based on plaintiff's RFC, the ALJ found, at the fourth step of the sequential analysis, that plaintiff could not perform her past relevant work. (T. 21). Finally, at the step five, the ALJ, referencing the testimony of the vocational expert, found that plaintiff could perform other work that existed in significant numbers in the national economy. (T. 21-22). Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act from November 22, 2008 through the date of his decision. (T. 22).

## V.    ISSUES IN CONTENTION

Plaintiff advances the following arguments:

(1)     The ALJ erred in evaluating plaintiff's non-exertional limitations, particularly the decreased range of motion in her neck and her loss of bi-manual manipulation.  (Pl.'s Br. at 1, 3-7).[4]

(2)     The ALJ erred in his analysis at step five because he relied upon hypothetical questions that did not accurately reflect plaintiff's RFC. (Pl.'s Br. at 1, 8-9).

This court agrees with the plaintiff that the ALJ erred in his RFC/credibility analysis, which tainted his ultimate finding that plaintiff was not disabled. Accordingly, the court recommends that this case should be remanded for further administrative proceedings so that the Commissioner may properly determine plaintiff's RFC and elicit and rely upon testimony from a vocational expert based on hypothetical questions that accurately reflect that RFC.

## VI.   RFC/CREDIBILITY

### A.   Legal Standards

#### 1.   RFC

Residual functional capacity ("RFC") is "what [the] individual can still do despite his or her limitations.  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."   A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL

---

[4] In connection with this argument, counsel also contends that the ALJ erred in his analysis of the credibility of plaintiff's statements regarding the extent of her limitations, by failing to provide supporting reasons with sufficient specificity.  (Pl.'s Br. at 5-6).

374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

As noted, the ALJ found that plaintiff had the RFC to perform sedentary work, with certain additional restrictions. The full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. §§ 404.1567(a), 416.967(a); SSR 96-9p, 1996 WL 374185, at *3. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about two hours of an eight-hour workday. Sitting would generally total

about six hours of an eight-hour workday.  SSR 96-9p, 1996 WL 374185, at *3.

"Most unskilled sedentary jobs require good use of both hands and the fingers; *i.e.*, bilateral manual dexterity."  SSR 96-9p, 1996 WL 374185, at *8.

## 2. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'"  *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work.  20 C.F.R. §§ 404.1529(c), 416.929(c).  When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the

claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## B.    Summary of Relevant Evidence

### 1.    Plaintiff's Testimony

At the administrative hearing on March 23, 2011, plaintiff testified that she had constant, burning neck pain that limited her ability to turn her head from side to side without pain. (T. 58, 59). The pain worked itself to the middle of her back and to her fingers, limiting her ability to grip items and periodically causing her to drop things. (T. 58). Plaintiff estimated that she could not lift more than five pounds and could not lift anything over her head. (T. 59). Because of the radiating pain, plaintiff testified that she could not sit for more than ten or fifteen minutes before she needed to get up and walk and stretch. (T. 60).[5] Treatment, including periodic injections, helped "sometimes and sometimes not." (T. 58). Plaintiff admitted that she used marijuana for a few months to ease her pain, but acknowledged that was not an appropriate way to address her pain. (T. 63). She stated that she did not have medical insurance and

---

[5] Plaintiff also described pain and limitations from extended sitting in her March 3, 2009 function report. (T. 254, 258).

had financial difficulty in paying for medication. (T. 64).[6]

In March 2011, plaintiff acknowledged that she drove once or twice per week for limited distances, although she had others drive her on "worse" days. (T. 59, 67). She testified that her daily routine consisted of getting her two sons off to school, and then spending most of the day doing dishes, laundry, and housecleaning, with periods of sitting and resting between chores. When her sons came home from work, she would prepare dinner and help them with homework. (T. 67, 68).[7]

At the administrative hearing on February 15, 2012, plaintiff testified that her physical limitations had gotten worse, and that, because of pain, she needed to sit down and rest after a short period of performing chores such as doing dishes or laundry. (T. 32, 34). She continued to have problems turning her head or looking up and down, to the point where she gave up driving. (T. 34-35). She also stated that her fingers get numb, mostly in her dominant, right hand. (T. 35).[8]

## 2. Medical Evidence

Plaintiff was periodically treated by Dr. Yurii Borshch and others at the Pain Clinic at Samaritan Medical Center between December 2007, following a fall from a

---

[6] The medical records corroborated that plaintiff's financial limitations sometimes affected her ability to follow through with treatment. (*See, e.g.*, T. 367, 424, 438).

[7] In her March 3, 2009 Function Report, plaintiff stated that her pain sometimes prevented her from performing these daily functions, and that her husband assisted her in these chores when necessary. (T. 254-56, 263).

[8] Plaintiff testified that her daily activities were also limited by her worsening depression (T. 33-34, 62); however plaintiff's mental limitations are not particularly relevant to the issues she raises in her challenge to the ALJ's last decision.

ladder, and December 2009, for, *inter alia*, neck and lower back pain.[9] (T. 339-45, 360-70, 454-58, 482-84, 568-73).[10] A May 28, 2008 examination of plaintiff "revealed aggravated pain on radiation to the right with extension of the neck" and Dr. Borshch proceeded with trigger point injections. (T. 368). On February 26, 2009, plaintiff advised that trigger point injections only provided very brief relief and reported pain in the neck and shoulders at "7 over 10" and occasional tingling in her fingers. (T. 366). The Pain Clinic ordered a cervical MRI, which was performed on March 2, 2009, and which indicated straightening of the normal cervical lordosis; evidence of decreased disc space height at C5-6; moderate, uncovertebral spurring, narrowing the left C5-7 neuroforamen, with some associated disc bulging; and minimal left-sided uncovertebral spurring at C3-4. (T. 363, 365).

Plaintiff reported increased pain "of 10 over 10" on March 12, 2009. A nurse practitioner palpated muscle spasms and trigger points and noted tenderness along the cervical spine, but found that plaintiff had good range of motion in her neck and shoulders. (T. 363). On March 23, 2009, Dr. Borshch performed a diagnostic cervical branch block on plaintiff's right side. (T. 360).

Plaintiff again had trigger point injections to treat her neck pain on May 14, 2009, and was "quite happy with the results." (T. 571). On June 23, 2009, plaintiff reported minimal neck pain, but left low back pain that was worse on extension and

---

[9] As the ALJ noted, there were some interruptions in plaintiff's treatment while she was out of state, attending to the affairs of her ill mother. (T. 15, 366, 437).

[10] Duplicates of some of these medical records appear elsewhere in the administrative record.

rotation to the left; and Dr. Borshch performed lumbar trigger point injections. (T. 569).[11] On August 4, 2009, plaintiff reported "at least one day of good pain relief" from her lumbar trigger point injections, but complained of neck pain on the right side. Dr. Borshch performed cervical trigger point injections on plaintiff. (T. 454). An MRI of plaintiff's lumbar spine on August 12, 2009 was unremarkable. (T. 457). On December 4, 2009, Dr. Borshch performed a radiofrequency ablation, L2, L3, L4, and L5 medial branches, left side, on plaintiff. (T. 482).

On April 10, 2009, Justine Magurno, M.D. conducted an internal medicine examination of plaintiff. Plaintiff complained of severe, chronic neck and back pain which affected her daily activities. The neck pain, described as 8/10 in severity, was constant, burning, and sharp, and radiated to the right shoulder, lower back, buttocks, and knee. Plaintiff stated that her head feels very heavy and is hard to hold up, and that turning her head aggravated her pain. Treatment, including trigger point injections, reportedly did not help. (T. 376).

Plaintiff reported that she shops once per week and cooks, cleans, and does laundry three times per week, depending on how bad her pain is, and sometimes with her husband's help. She showers three to four times per week and dresses five to seven times per week, but requires help from her husband. (T. 377).

On examination, Dr. Magurno found that plaintiff's cervical spine showed

---

[11] Plaintiff was admitted to Samaritan Medical center on June 23rd because of depression and some suicidal thoughts. (T. 420-22). She was admitted to the mental health unit again, from July 15-17 and October 2-5, 2009, following suspected overdoses of Soma, a muscle relaxant, which plaintiff claimed she took to address her pain and help her sleep. (T. 432-33, 459-61).

flexion of 20 (out of 45) degrees; extension of 10 (out of 45 degrees)[12]; rotation-right of 60 (out of 80) degrees and full rotation-left; and lateral flexion-right of 30 (out of 45) degrees and full lateral flexion-left. Dr. Magurno found tenderness on the lumbar and cervical spine and paraspinal muscles, more on the right than on the left. Straight leg raises were positive on the right at 30 degrees and negative on the left.[13] (T. 378). An x-ray of the cervical spine showed straightening, but "no acute bony abnormalities," and a lumbar x-ray was negative. (T. 379, 381-82). Plaintiff had a full range of motion in her elbows, forearms, wrists, and hands bilaterally; intact dexterity in her hands and fingers; and grip strength of 4/5 right and 5/5 left. (T. 378, 379).

Dr. Magurno diagnosed plaintiff with, *inter alia*, neck and back pain with radicular symptoms and found her prognosis stable to poor. (T. 379). She opined that plaintiff had "marked" limitations for reaching, pushing, or pulling on the right, and for bending, lifting and carrying; moderate to marked limitations for walking and standing; and "moderate" limitations for sitting. Dr. Magurno also concluded that plaintiff had no observed limitations for fine motor activities or reaching, pushing, or pulling on the left. (T. 380).

---

[12] Different sources report that normal or full flexion of the cervical spine is 45 or 50 degrees and normal extension is 45 or 60 degrees. Cf. www.vba.va.gov/pubs/forms/ VBA-21-0960M-13-ARE.pdf (Veterans Administration–45 degrees) and www.dshs.gov/pdf/ms/forms/13_585a.pdf (State of Washington Department of Social and Health Sciences–50 degrees flexion and 60 degrees extension). Both sources agree that, for the neck or cervical spine, "normal" lateral flexion is 45 degrees and "normal" rotation is 80 degrees.

[13] Positive straight leg raise results are indicative of a herniated disc. http://www.webmd.com/back-pain/medical-history-and-physical-exam-for-a-herniated-disc.

## C.    Analysis

As noted, the ALJ determined that plaintiff could perform unskilled sedentary work with the additional limitations that she could lift and/or carry up to ten pounds occasionally and frequently, stand and/or walk up to six hours and sit up to six hours in an eight-hour workday, and perform postural maneuvers occasionally; but she could not reach overhead with her right upper extremity.  (T. 18-19).  Plaintiff argues that the ALJ erred in not assessing additional limitations relating to plaintiff's range of motion in her neck and her ability to manipulate with her hands.  At the second administrative hearing, plaintiff's counsel also suggested that the ALJ erred in not finding that plaintiff had additional limitations with respect to prolonged sitting.  (T. 50).

### 1.    Alleged Limitations on Flexion and Extension of the Neck

The ALJ concluded that plaintiff's statements about her difficulties with "turning her head" were not credible because "the medical evidence does not reflect treatment for this condition or any diagnosis or impression regarding the cause of the asserted problem."  (T. 21).  However, following plaintiff's complaints of neck pain on extension in May 2008 and a cervical MRI in March 2009, the Samaritan Medical Center diagnosed plaintiff with, *inter alia*, cervical facet arthropathy[14] and cervical

---

[14] "The Facet joints are the joint structures that connect the vertebrae to one another. . . . Facet Disease occurs when there is degeneration of the facet joint."
http://pain-medicine.med.nyu.edu/patient-care/conditions-we-treat/facet-joint-disease.
"Facet joint disorders are some of the most common of all the recurrent, disabling low back and neck problems, and can cause serious symptoms and disability for patients."
http://www.spine-health.com/conditions/arthritis/symptoms-and-diagnosis-facet-joint-problems.

radiculopathy.[15]  As noted above, Dr. Borshch of the Pain Clinic treated plaintiff's neck impairments with trigger point injections and a cervical branch block.  Thus, the ALJ's stated reason for rejecting the allegations that plaintiff had significant limitations in moving her head is inconsistent with the medical evidence reflecting that she was diagnosed and treated for associated impairments.

In light of the absence of any assessments of the plaintiff's physical limitations by a treating source, the ALJ gave "evidentiary weight" to the assessment of consulting examiner, Dr. Magurno.  (T. 21).  However, in assessing the medical findings and opinion of Dr. Magurno, the ALJ ignored the doctor's findings that plaintiff had a substantially decreased range of motion in her cervical spine, which corroborated plaintiff's statements regarding difficulties in moving her head.  (T. 15-16, 19).  The ALJ cannot "cherry pick" only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence.  *See, e.g., Royal v. Astrue*, No. 5:11-CV-456 (GTS/ESH), 2012 WL 5449610, at *6 (N.D.N.Y. Oct. 2, 2012) (while ALJs are entitled to resolve conflicts in the record, they cannot pick and choose only evidence from the same sources that supports a particular conclusion) (citing, *inter alia*, *Fiorello v. Heckler*, 725 F.2d 174, 175-76 (2d Cir. 1983)) (Rep't-Rec.), *adopted*, 2012 WL 5438945 (N.D.N.Y. Nov. 7, 2012).

The ALJ's error in not assessing further limitations with respect to plaintiff's

---

[15] "Cervical radiculopathy is the clinical description of pain and neurological symptoms resulting from any type of condition that irritates a nerve in the cervical spine (neck). . . .  When any nerve root in the cervical spine is irritated through compression or inflammation, the symptoms can radiate along that nerve's pathway into the arm and hand. http://www.spine-health.com/conditions/neck-pain/what-cervical-radiculopathy.

ability to move her head and neck, or in failing to acknowledge and explain medical evidence that supported plaintiff's claims, is not harmless. As discussed below, the vocational expert ("VE") appeared to conclude that the various unskilled, sedentary jobs that, in his opinion, could be performed based on the ALJ's RFC determination, would not be consistent with an RFC that involved significant limitations on the flexion or extension of plaintiff's neck. (T. 46, 49). Although plaintiff's counsel alerted the ALJ that Dr. Magurno's report supported plaintiff's claim that she was limited in her ability to move her neck (T. 50), the ALJ did not follow up with the VE by asking whether there were other sedentary jobs that plaintiff could perform with that additional limitation. *Cf. Pizzo v. Barnhart*, 325 F. Supp. 2d 438, 450-51 (S.D.N.Y. 2004) (the ALJ erred in giving no weight to the opinion of a treating doctor that the plaintiff could perform only a narrow range of sedentary work given, *inter alia*, an MRI of plaintiff's cervical spine revealing mild degenerative disease and other medical evidence of marked limitation of motion of the neck, tenderness along the cervical spine and upper back, and tenderness to palpation of the lumbar muscles and lumbar spine).[16]

## 2. Alleged Limitations on Plaintiff's Use of Her Hands

The court concludes that the medical evidence of record provides substantial support for the ALJ's implicit conclusion that the plaintiff's ability to do unskilled

---

[16] *Compare Sessions v. Astrue*, No. 08-CV-0724-A, 2010 WL 883697, at *7-8 (W.D.N.Y. March 8, 2010) in which the court upheld a finding that plaintiff was not disabled based on the ALJ's RFC that plaintiff's ability to perform sedentary work was limited by, *inter alia*, her inability to engage in repetitive flexion or extension movements of the cervical or lumbar spine or the knees, because the VE was specifically asked about that limitation and identified three jobs that a person with those limitations could perform.

sedentary work was not significantly impaired by limitations in her ability to make good use of both hands. As discussed above, the report of Dr. Magurno indicated that plaintiff's hand and finger dexterity was intact, and that her range of motion with the upper extremities was not limited. Other than reporting a few complaints from plaintiff regarding tingling in her fingers, the reports from the Pain Clinic at Samaritan Medical Center did not provide any evidence corroborating plaintiff's claims of substantial limitations in the ability to use her hands.

### 3. Limitation in Prolonged Sitting

The plaintiff testified that she could not sit for more than ten or fifteen minutes before she needed to get up and walk and stretch. As discussed above, the medical evidence indicated that plaintiff suffered from radiating neck and back pain, which could well limit her ability to sit for prolonged periods. The ALJ determined that plaintiff could sit for up to six hours in an eight-hour workday. The only apparent support from the medical evidence for this aspect of the ALJ's RFC determination was Dr. Magurno's opinion that plaintiff had "moderate" limitations for sitting, which the doctor did not further define. (T. 19, 380).

Standing alone, Dr. Magurno's indefinite conclusion regarding the "moderate" limitations on plaintiff's ability to sit does not provide substantial evidence for the ALJ's conclusion that she could sit for six hours of an eight-hour workday, at least without additional restrictions. Nor does Dr. Magurno's opinion provide support for the ALJ's apparent determination that plaintiff's statements about her limited ability to sit were not credible. *See, e.g.*, *Petersen v. Astrue*, No. 11-CV-116 (GTS/VEB), 2012

WL 4449857, at *4-5 (N.D.N.Y. Aug. 10, 2012) (the ALJ afforded "great weight" to Dr. Magurno's opinion; however, Dr. Magurno's assessment that plaintiff had "marked limitations for walking, standing, bending, pushing, pulling, lifting, and carrying" and "moderate limitations for sitting an[d] reaching" do not support the ALJ's conclusion that plaintiff retained the RFC to perform sedentary work) (Rep't-Rec.), *adopted*, 2012 WL 4449663 (N.D.N.Y. Sept. 25, 2012)[17]; *Richardson v. Astrue*, No. 10 Civ. 9356, 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (the consulting doctor's vague conclusion that plaintiff's ability to sit was "mildly to moderately" impaired provides no support for ALJ's conclusion that plaintiff could perform sedentary work) (citing, *inter alia, Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (the "use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ . . . to make the necessary inference that [the plaintiff] can perform the

---

[17] At first blush, *Peach v. Astrue*, No. 08-CV-741 (FJS/VEB), 2009 WL 7113220, at *7 (N.D.N.Y. Dec. 3, 2009) is difficult to reconcile with the holding of *Petersen*, which was recommended by the same Magistrate Judge. In *Peach*, the court found that the opinion of a consultative examiner that plaintiff had "moderate" exertional limitations in sitting, standing, walking, lifting, carrying, pushing, and pulling, and the conclusion of a disability analyst that, *inter alia*, plaintiff could stand and/or walk at least two hours and sit about six hours in an eight-hour workday provided substantial evidence to support the ALJ's RFC determination that the plaintiff could perform sedentary work, notwithstanding a contrary opinion from a treating doctor that plaintiff's ability to sit and stand was more restricted. However, as the ALJ recognized in this case, an RFC analysis by a single disability analyst, like the kind that the ALJ and the court relied upon in *Peach*, is entitled to "no evidentiary weight." (T. 31, 56). As noted in *Martin v. Astrue*, No. 7:10-CV-1113 (TJM), 2012 WL 4107818, at *15 (N.D.N.Y. Sept. 19, 2012): "On May 19, 2010, the Chief Administrative Law Judge for the Social Security Administration issued a memorandum . . . instructing all ALJs that RFC determinations by SDMs [single decision makers] should not be afforded any evidentiary weight at the administrative hearing level. Numerous courts have concluded, per this memorandum, that assigning any evidentiary weight to an SDM's opinion is an error." (citations omitted). This change in the law since May 2010 explains the differing holdings in *Peach* (in 2009) and *Petersen* (in 2012).

exertional requirements of sedentary work")[18] (Rep't-Rec), *adopted*, 2011 WL

3477523 (S.D.N.Y. Aug. 8, 2011); *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529

(S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional

capacity determination based on medical reports that do not specifically explain the

scope of claimant's work-related capabilities.").

During the second administrative hearing, plaintiff's counsel asked the VE to

consider an additional limitation on plaintiff's ability to sit–that she would need to

shift positions from sitting to standing every 30 minutes. The VE appeared to opine

that this additional limitation would not preclude plaintiff from performing the jobs he

had previously identified as within her vocational abilities. (T. 44-45). This alone,

however, would not make the ALJ's error harmless, in that there was not substantial

evidence, on the current record, for the ALJ's finding that plaintiff could sit for six

hours in an eight-hour workday–an inherent requirement for sedentary work–even if

---

[18] Cases such as *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), confirm that *Curry* remains sound authority with respect to an ALJ's RFC determination at step four of the sequential disability analysis, although *Curry* was superseded by a change in the Social Security regulations, 20 C.F.R. § 404.1560(c)(2), with respect to the extent that the burden of proof is shifted to the Commissioner at step five. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (under the revised regulation, the Commissioner need only show, at step five, that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity). Some post-*Curry* cases have held that "use of terms like 'mild' and 'moderate' has been held to pass substantial evidence muster when medical evidence shows relatively little physical impairment" or the medical scenario is not complex. *Anderson v. Colvin*, No. 5:12-CV-1008 (GLS/ESH), 2013 WL 5939665, at *9 (N.D.N.Y. Nov. 5, 2013) (citation omitted). *See also Lewis v. Colvin*, 548 F. App'x 675, 677-78 (2d Cir. 2013) (the ALJ's determination that plaintiff could perform light work is supported, *inter alia*, by Dr. Datta's assessment of **mild** limitations for prolonged sitting, standing, and walking and direction that Lewis should avoid **heavy** lifting, and carrying). Given the evidence of plaintiff's physical impairments in this case, the opinion of a consulting doctor that plaintiff had "moderate limitations for sitting," without more, does not amount to substantial evidence supporting the ALJ's determination that she could sit for six hours during an eight-hour workday.

plaintiff were allowed to change positions.

### 4.    Other Issues Relating to Plaintiff's Credibility

The ALJ considered plaintiff's abuse of pain medication as one factor undermining her credibility.  (T. 21).  It is not entirely clear whether the ALJ is referring to plaintiff's use of marijuana to address her pain or her apparent overdoses on Soma, both of which occurred in 2009, but were apparently not repeated thereafter. (T. 432-33, 459-60).  It is true that abuse of pain medication may indicate drug-seeking behavior and may undermine the credibility of allegations of pain.  *See, e.g., Metz v. Astrue*, 1:06-CV-1509 (FJS/DRH), 2010 WL 2243343, at *14 (N.D.N.Y. Apr. 21, 2010) (Rep't-Rec.), *adopted*, 2010 WL 2243347 (N.D.N.Y. May 31, 2010). However, in this case, plaintiff's misuse of a muscle relaxant,[19] as opposed to an opiod, and the fact that her "overdose" was associated with mental health impairments, reduces the impact of this conduct on her credibility.  Moreover, the plaintiff's resort to marijuana and excessive doses of Soma also serve to corroborate her claims that she suffered from severe pain that was not addressed by prescribed medication.  *See Sevene v. Astrue*, No. 2:10-CV-302, 2011 WL 4708793, at *6 (D. Vt. Sept. 15, 2011) (although plaintiff's well-documented abuse of pain medication, including prescribed narcotics, may indicate that his complaints of pain were motivated by a desire to obtain narcotic pain medications; it could also indicate that plaintiff's allegations of a high pain level were truthful) (citing, *inter alia*, SSR 96-7p, 1996 WL 374186, at *7 ("[p]ersistent attempts by [claimants] to obtain relief of pain

---

[19] Soma is a muscle relaxer that works by blocking pain sensations between the nerves and the brain.  http://www.drugs.com/soma.html.

or other symptoms, such as by increasing medications, . . . may be a strong indication that the symptoms are a source of distress to the [claimant] and generally lend support to a [claimant's] allegations of intense and persistent symptoms") (Rep't. Rec.), *adopted*, 2011 WL 4708787 (D. Vt. Oct. 4, 2011).

Although these factors were not referenced by the ALJ in his conclusions regarding plaintiff's credibility (T. 21), defense counsel argues that plaintiff's claims regarding her physical impairments were undermined because of the scope of her daily activities and because she did not undergo any treatment for neck or back pain after 2009.[20]  As discussed above, plaintiff made clear that her performance of various daily activities was adversely affected by, and was, on frequent "bad" days, precluded by, her pain and other physical and mental impairments.  Plaintiff's admissions about her daily activities are not inconsistent her statements about her symptoms and limitations, which may explain why the ALJ did not specifically refer to plaintiff's daily activities in concluding why he questioned her credibility.

Plaintiff's access to treatment was limited, at times, by her lack of medical insurance and financial resources, and her travel to Florida to attend to her ill

---

[20] Defense counsel also argued that plaintiff's credibility was undermined by her sporadic employment history, although the ALJ did not articulate any such finding.  As the Second Circuit stated in *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998):  "A claimant's failure to work might stem from her inability to work as easily as her unwillingness to work.  Therefore, a consideration of work history must be undertaken with great care.  An ALJ should explore a claimant's poor work history to determine whether her absence from the workplace cannot be explained adequately (making appropriate a negative inference), or whether her absence is consistent with her claim of disability.  In any event, it bears emphasizing that work history is just one of many factors that the ALJ is instructed to consider in weighing the credibility of claimant testimony."  Given that the ALJ did not assess the significance of plaintiff's sporadic job history, no inference should be drawn with respect to plaintiff's credibility from the fact that the ALJ briefly mentioned certain aspects of her work history.  (T. 20).

mother.[21]  If the ALJ had relied on the lack of treatment that plaintiff received for physical limitations after 2009 to question her credibility, he should have further explored whether plaintiff's financial limitations affected her ability to follow through with treatment.  *See, e.g., Garrett v. Astrue*, No. 05-CV-6524, 2007 WL 4232726, at *9 (W.D.N.Y. July 18, 2007) (it was improper for the ALJ to question plaintiff's credibility based solely on her inability to afford treatment) (citing, inter alia, SSR 96-7p, 1996 WL 374186, at *7-8 ("in assessing credibility, the ALJ has a duty to inquire about possible explanations for non-compliance, or for lack of treatment. . . . Such explanations may include the following: . . . the individual may be unable to afford treatment and may not have access to free or low-cost medical services. . . .")).

## VII.  STEP FIVE/VOCATIONAL EXPERT

### A.    Legal Standards

At step five of the disability analysis, the burden of proof shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform.  *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out this fifth step by applying the applicable Medical-Vocational Guidelines ("the Grids").  *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)).  But if plaintiff has non-exertional impairments, and if those non-exertional impairments "significantly limit the range of work" permitted by his exertional impairments, the ALJ may be required to consult a vocational expert ("VE").  *Bapp v. Bowen*, 802 F.2d 601, 605-06 (2d Cir. 1986).

---

[21] See notes 6 and 9, above.

If the ALJ does use a VE, he presents the expert with a set of hypothetical facts to determine whether plaintiff retains the capacity to perform any specific job. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). The ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an ALJ's RFC analysis, which is supported by substantial facts, the hypothetical is proper. *Id*. at 276-277. Conversely, a VE's opinion in response to an incomplete hypothetical question cannot provide substantial evidence to support a denial of disability. *See DeLeon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984) (finding that, as a result of the ALJ's failure to present the full extent of the claimant's physical disabilities to a vocational consultant, the record provided no basis for drawing conclusions about whether the claimant's impairments rendered him disabled).

### B. Analysis

During the February 15, 2012 administrative hearing, the ALJ posed hypothetical questions to the VE that reflected the ALJ's RFC determination for plaintiff, as set forth in his decision, with one significant exception. The ALJ asked the VE to assume the hypothetical claimant was limited to "no more than occasional reaching overhead on the right side" (T. 42), while the ALJ's RFC for plaintiff included a more extensive limitation of no overhead reaching using the right, upper

extremity (T. 18-19).[22]  Defense counsel argues that this error was harmless because the jobs that the VE testified that were consistent with the ALJ's RFC determination would still be within plaintiff's vocational abilities, given that she was not limited in overhead reaching with her left extremity.  However, the VE testified that all of the jobs he discussed required frequent reaching, at least horizontally (T. 46-47), and he was not asked to clarify whether they required some overhead reaching with the claimant's dominant hand, or with both hands.  Because this case must be remanded in any event, the Commissioner should ensure that the hypothetical questions to the VE reflect the appropriate RFC, so that a clear opinion can be obtained.

The ALJ's failure, at step four of the sequential disability analysis, to properly assess all of plaintiff's physical limitations, including those relating to her ability to move her neck and head and her capacity for prolonged sitting, also tainted his analysis at step five.  Plaintiff's counsel asked the VE whether a hypothetical claimant could perform the jobs the VE previously identified if the claimant were limited to occasional flexion and extension of the neck.  (T. 44, 46).  While the VE struggled with the impact of such a limitation, he seemed to conclude that all of the sedentary jobs that he identified might not be suitable for a person with a limited capacity for flexion and extension of the neck.  (T. 45-46, 48, 49).[23]  The VE opined that plaintiff

---

[22] As noted above, plaintiff's right hand was her dominant hand.

[23] Certain key portions of the VE's testimony, which was taken over a video link, are reflected as inaudible on the transcript.  (T. 30, 47, 49).  Plaintiff's counsel, who participated in the hearing, asserted that the VE said that he could not identify any simple, sedentary jobs that could be performed by someone with the additional limitation of reduced flexion and extension of the neck.  (Pl.'s Br. at 6).

could perform the jobs he identified if the hypothetical claimant was required to shift positions between sitting and standing frequently (T. 45); but he was not asked if those jobs were possible if the claimant could sit for less than six hours in an eight-hour workday, even with the ability to change positions.

In short, given the ALJ's errors in his RFC and credibility analysis at step four, this court cannot be confident that, at step five, the ALJ posed and relied upon proper hypothetical questions to the VE that reflected an RFC determination, with all relevant limitations, that was supported by substantial evidence. On remand, the ALJ must perform a proper RFC/credibility analysis and formulate proper hypothetical questions reflecting all applicable limitations.

## VIII. <u>NATURE OF REMAND</u>

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). This court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996). However, given the extensive delays in the administrative review of this case, the court recommends that the proceedings on remand be expedited.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED**, that the decision of the Commissioner be **REVERSED** and this case **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for a

proper determination of plaintiff's residual functional capacity and credibility, and other further proceedings, consistent with this Report.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: June 16, 2014

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**